## Smith v. Smith.

(Decided June 11, 1918.)

### Appeal from Harlan Circuit Court.

1. Divorce—Defenses.—It is a fundamental principle in equity that he who seeks its aid must approach its forum "with clean hands," and this wholesome principle applies to proceedings for divorce, and there it is called and known as the doctrine of "Recrimination." In such proceeding it is competent for the defendant to allege and prove as a defense to and in defeat of plaintiff's right to a divorce that he or she has been guilty of conduct which furnishes a ground for absolute divorce, and such ground, in order to defeat the plaintiff's right to a divorce, need not be the same one upon which he relies to obtain a divorce from the defendant, but it will be sufficient to defeat his divorce if he is found guilty of any legal ground authorizing a divorce on behalf of the defendant.

2. Divorce—Evidence.—If upon trial the evidence is sufficient to convict both parties of the respective charges alleged against them, there should be no absolute divorce granted to either, but whether this would be a sufficient ground to authorize a divorce a mensa et thoro is not necessary to decide.

3. Divorce—Evidence—Adultery.—The testimony of a co-respondent in a divorce case on the issue of adultery should be received with great caution and the same is true where the witness obtained his alleged facts as a detective employed for the purpose, and if such a witness gives his testimony willingly without the aid of the process of the court, it would be authorized to discard his testimony altogether and should do so if there is no showing of the witness' credibility or good character in some of the methods pointed out in section 2119 Kentucky Statutes.

4. Divorce—Adultery.—An unfounded and malicious charge of adultery or unchastity is at least competent and potent evidence on a charge of cruelty preferred by the wife against her husband, but whether it is sufficient of itself, when corroborated, to establish a charge of cruelty is not decided, since it is not necessary to the determination of this case.

5. Divorce—Evidence—Review.—While this court can not reverse a decree granting an absolute divorce, yet it may review the evidence for the purpose of determining whether the divorce was proper, and if found to be improper to then direct such judgment in regard to alimony and property rights of the wife and children as it deems the circumstances justify.

6. Divorce—Alimony.—There is no fixed rule concerning the amount of the husband's property which will be allowed to the wife as alimony, and each case must be governed by its own particular facts and circumstances. Where the court is of the opinion that the interest and welfare of the wife and her infant children, whose custody she was given by the trial court, would best be subserved by making monthly allowances instead of a lump sum, the former will be decreed, and in fixing such allowance the guilt or innocence of the parties, the ability of the husband to pay, as well as a due regard for the maintenance of the wife and children in such comfortable circumstances as their surroundings and station in life demand will each and all be considered.

METCALF & JEFFRIES, HENRY JACKSON, JOHN W. RAWLINGS and CLAY & CARTER for appellant.

EDWARD C. O'REAR and J. S. FORESTER for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellee and plaintiff below, W. H. H. Smith, brought this suit in the Harlan circuit court against his wife, the defendant and appellant here, Sarah Smith, seeking a divorce from the bonds of matrimony upon the ground that she had been guilty of adultery with J. E. Kirby, Edgar Thomas, J. H. Smith, "and others, whose names are now unknown to the plaintiff." He charged that because of the defendant's unchastity she was an unfit person to have the custody of their children, whose names and ages are Matilda Smith, aged nineteen years; Laura Smith, seventeen years; Noble Smith, fifteen years; Creed Smith, twelve years; Delano Smith, ten years, and Edna Smith, six years. The answer denied the allegations of the petition, except as to the charge of adultery with J. E. Kirby, and in another paragraph defendant pleaded that her conduct with Kirby occurred in the early part of the year 1912, and that plaintiff had full knowledge of it and forgave the defendant and condoned the act, and afterwards lived and cohabited with her as his wife. In a third paragraph, which she made a counter-claim against plaintiff, she relied upon the two statutory grounds of divorce of (1) cruel and in-

human treatment toward her by the defendant for not less than six months in such a manner as to indicate a settled aversion to her and to destroy permanently her peace and happiness, and which treatment consisted in beating, striking and bruising the defendant, and falsely accusing her of committing the crime of adultery, and of maintaining a house of ill-fame and (2) abandonment without support for more than twelve months.

She afterwards, by amended answer and counter-claim, alleged that plaintiff was guilty of living in adultery with one Eula Sergent, *alias* Eula Howard, and upon the three grounds relied upon in her counter-claim as amended she asked that she be granted an absolute divorce from her bonds of matrimony. Appropriate pleadings denied her allegations, and upon trial, after considerable preparation, the court sustained the prayer of the petition and granted to plaintiff an absolute divorce, annulling the marriage between him and the defendant and dismissed defendant's counter-claim for the same relief, but with the wife's character thus blackened he adjudged the custody of the children to the defendant and allowed to her and them the use of a residence in Danville, Ky., where they had been living while the children attended school since August, 1912, and that plaintiff be required to pay for the joint use of the wife and children one hundred and fifty dollars per month, and that plaintiff should pay the expenses of the children in attending school. Afterwards defendant, upon notice, entered a motion to modify the judgment and to allow to her a permanent sum in alimony, which she insisted upon as being fixed at one hundred thousand dollars, and that the attorney's fee of seven hundred and fifty dollars, which had been allowed to her attorneys in the original judgment, be increased to the sum of ten thousand dollars. That motion was overruled and defendant prosecutes an appeal from that order, as well as from the original judgment, insisting that the court erred under the facts disclosed by the record in disallowing her alimony in the sum allowed for the children, and in fixing the fee of her attorneys at only seven hundred and fifty dollars.

It is scarcely necessary to state that however erroneous the judgment granting the divorce may be in our estimation, there is no appeal from it and it can not be

interfered with, but it is equally true that this court, upon appeal, even where a divorce has been granted and alimony disallowed, may look into the record and the facts and if it is found that the judgment annulling the bonds of matrimony should not have been rendered, to order and direct such a judgment concerning alimony and the property rights of the parties as the law and facts authorize. Burns v. Burns, 173 Ky. 105; McClintock v. McClintock, 147 Ky. 409; Tilton v. Tilton, 16 R. 537; Zumbiel v. Zumbiel, 113 Ky. 84; Freeman v. Freeman, 11 R. 824, and numerous other cases which might be cited.

It therefore becomes necessary to look to the record to ascertain the facts and to determine the rights of the parties. It, in a large measure, portrays the dramatic as well as the pathetic. In 1888 the plaintiff was living with his mother in Harlan county on about five hundred acres of mountain land, a small portion of which was tillable, and it was bountifully supplied with timber upon the surface and minerals under the surface. His mother was old and feeble. There lived nearby a woman who was the mother of some three or four illegitimate children, one of whom was the defendant in this case, and she was twelve years of age. Through some arrangement the defendant went to live with the plaintiff and his mother to assist the latter in doing the household work and perhaps looking after her ailments. She was rather precocious physically and otherwise, and within a short time thereafter the plaintiff, who was then thirty-five years of age, began to show her such kindnesses and attentions as invariably captivate a female child of that age. He would give her presents, consisting of candy and other cheap articles, calculated to arouse her appreciation, and finally his conduct toward her assumed a fondling aspect and resulted in his eventually seducing her. She became the mother of a child when she was only about fourteen years of age. After that their illicit relations became more pronounced until finally they were living in open adultery and at regular periods a new child would be born, until 1899 or 1900, when plaintiff's mother died, defendant was the mother of five illegitimate children, whose father he was. They were then married and several children were born after the marriage. She continued to live upon the farm, doing not only

the household work, but milking and washing and frequently working in the fields and perhaps doing other work more assignable to masculine hands. The extent of that work was largely increased because plaintiff was at the time defendant went to his home engaged in getting out timber and working many hands, some of whom he boarded and fed. That character of work increased as plaintiff continued to buy more land surrounding his original place until he acquired some four or five thousand acres, and at the time of the rendition of the judgment it was worth between four hundred thousand and six hundred thousand dollars. In addition he is shown to possess stock, cattle and other property, the exact amount of which is not shown. The only assistance in cooking and doing the other kind of work herein stated which the defendant had was that furnished by her daughters as they grew large enough to help her. When she would be confined in childbirth it was never exceeding seven days, and then she would be put in a cabin in the yard and not allowed to stay in the regular residence. But twice did she have a doctor to attend her and at one time her child was born without any one being present. In 1910 plaintiff gave some kind of option on his land, the exact nature of which is not disclosed by the record, but he received therefor the sum of ten thousand dollars in cash. The option was not exercised according to its terms, which resulted in the forfeiture of the ten thousand dollars to plaintiff. Directly afterwards plaintiff and defendant made a trip, which was perhaps about the first time that either of them, especially defendant, was ever out of Harlan county. This trip was to points in Virginia and Washington, D. C., and after the return it appears that through the importunities of defendant, the plaintiff was persuaded to give his children a better education than the facilities in the local public schools offered and two of them were sent to a cheap school in Tennessee. The necessity of educating the other children as they grew old enough to receive it and the desire of the two oldest who had been sent away to school to pursue higher branches, and the desire to rear her children in a better social atmosphere, with a full realization that they were able to do so, led Mrs. Smith to request her husband that they locate in some place where they could be furnished

with appropriate educational facilities. They made some trips in search of a suitable location with that end in view and finally the husband purchased a house and lot in Danville, Ky., where the wife and children took up their temporary abode, and the children were put in school. This was done in August, 1912. From that time to the filing of this suit, which was on the 12th day of February, 1916, the wife and the children occupied the Danville residence, while plaintiff spent the greater portion of his time at the old homestead in Harlan county, but he would, upon occasions, visit his family in Danville. The children regularly attended school and made at least an average advance in their studies. Both they and their mother seem to have built fair and honorable reputations in that community, as is attested by the testimony of the leading citizens of that town. One of the daughters is an organist of one of the leading churches there, while the other is a member of the choir. In the early part of 1912, and before the defendant and the children moved to Danville, the defendant was in Middlesboro, Ky., either on a trip going or returning to the place where her daughters or one of them was attending school, and while there she met J. E. Kirby, whom she had known for quite a while, and in a weak moment she surrendered to his importunities and while they were in a room together at a hotel the plaintiff appeared and found them jointly occupying the same room; and this is the act of adultery which defendant admits and which she alleged and the proof establishes was condoned by the husband. Kirby further testified that he had just prior to that time had intercourse with defendant in Pineville, but this is refuted by counter testimony and in addition the proof convinces us that the condonement was for all the offenses which the defendant committed with Kirby. Edgar Thomas testified that in the latter part of 1911 he met the defendant in Knoxville, and he had intercourse with her at a hotel in that place, and that shortly thereafter and perhaps the early part of the year 1912 he engaged in similar conduct with her at Middlesboro. These acts of adultery, as testified to by the witness Thomas, are denied by the defendant, and there is nothing in the record, either by direct testimony of witnesses, by certificate of the officer taking the depositions or the finding of the court showing that the witness Thomas was

a credible one or that he bore a good character, as is required by section 2119, Kentucky Statutes, and unless this is done in some one or more of the methods enumerated, the uncorroborated testimony of such a witness should not furnish grounds for dissolving the bonds of matrimony and destroying the law's cherished status of the parties and indirectly heaping disgrace and humiliation upon the defendant and her innocent children. Besides this witness was a most willing one. He acknowledged that he gave his deposition without being forced to do so and after he had been promised his expenses and payment for his lost time.

In the case of Beeler v. Beeler, 19 R. 1936, it is said in speaking of this character of witness "that but little credit should ordinarily be given to the testimony of a co-respondent who voluntarily testifies against a respondent," and in Evans v. Evans, 93 Ky. 510, it is said: "So far as this record shows he (the co-respondent) was an entirely willing witness. He does not appear to have been attached or made to testify. It is not even shown that he was subpoenaed as a witness. He was entirely willing to not only destroy the wife, affix a stain to her children and family, but also to testify to conduct degrading to and highly blamable in himself. Such evidence is justly subject to suspicion. It comes in doubtful form." Text-writers and other courts lay down the same cautionary rule in the admission of the testimony of the character of witnesses under consideration, and under the circumstances we seriously doubt if this witness' testimony should have been given any weight at all.

The only other testimony in support of the charge against the defendant comes from the plaintiff's nephew, J. H. Smith. He lives in Tennessee, and is about the age of the defendant, and has known her all of his life. Some time in the latter part of 1915 he met plaintiff in Middlesboro, which, it seems, was by appointment, and plaintiff there said to him "that his (plaintiff's) wife was running around from one place to another to Knoxville and Cincinnati and whoring it around and he wanted him (J. H. Smith) to help catch her." This charge was in the face of the fact that no trip by the wife to any of the places mentioned or elsewhere, was proven or offered to be proven after she went with her children to Danville, in 1912. Letters passed between them, resulting in the nephew assuming the role of detective, and, in consideration of an

agreement to be paid two hundred and fifty dollars in cash and his expenses, he started out on his mission. He visited his aunt, the defendant, at her home, where he was cordially received by all of the family, and he and defendant went to some of the stores in Danville in the daytime and perhaps took a trip around the town in a buggy. Nothing improper occurred and witness stayed overnight at defendant's home, leaving the next morning, and within a short time thereafter he again came to Danville and spent another night, when, as he claims, he had intercourse with defendant. This was, according to his testimony, in the early part of 1916, and just before the filing of the petition. He states that in furtherance of his detective work he derided the plaintiff to the defendant and stated to her that she was ill-mated and that she should separate from the plaintiff and that he would separate from his wife, each of them obtain a divorce and then marry. He furthermore acknowledges that he had ill-will toward the defendant, and that he did not particularly desire the act of intercourse in which he engaged with defendant, but that he bore the burden of it in carrying out a loyal duty to his uncle. He testified that the act of intercourse occurred between nine and ten o'clock at night, and in the room where he was sleeping, which was down stairs. Defendant and her son, Noble, testified that nothing of the kind occurred and that the defendant, until after twelve o'clock that night, was sitting up with her youngest son, Dan, who was at that time sick and required nursing; that she retired about twelve o'clock in a room up stairs, where she remained throughout the night. The credibility of the nephew, Smith, is not established by any of the methods pointed out by the section of the statute, *supra,* and in addition to his being a willing witness, testifying without being served with any character of process, he is furthermore discredited by being a detective, specially employed to create, procure and establish the grounds for divorce, and he appears to not only be able and willing to play that part, but likewise and with equal determination to play the part of paramour and manufacturer of testimony, and he also served a term in the penitentiary for voluntary manslaughter. In 9 R. C. L., 331, in discussing the effect of testimony from a witness like this, the text is:

"It has been said that the testimony of a private detective, hired by one spouse to watch the other, with the view of learning facts on which to base a suit for divorce, will be regarded with much suspicion, especially where it does not appear that his pay is independent of the successful effect of his evidence; and it may be stated as a very generally recognized rule that testimony of detectives introduced to prove adultery must be scrutinized closely and received with great caution. Usually it is held that such testimony is of very little weight in proving the offense. Some cases even go to the extent of holding that a decree should not be granted on the unsupported testimony of such persons; and this would seem to be especially proper where the detectives are employed with the view of procuring evidence by promoting the act of adultery."

The excerpt just taken is supported by these cases found in the notes: Taft v. Taft, 80 Vt. 256, 130 A. S. R. 994, 12 Ann. Cas. 959, and Dennis v. Dennis, 68 Conn. 186, 57 A. S. R. 95, 34 L. R. A. 449. So that we find that this witness, who is the only one testifying to any adulterous acts of defendant occurring subsequent to the condonement, labors under the difficulties of (a) not having his credibility certified to or shown in the manner required by the statute; (b) is himself a co-respondent; (c) is a willing witness, giving his testimony without being brought into court with legal process and being paid for his services; (d) he is an ex-convict, and lastly he is a detective, "employed with the view of procuring evidence by promoting the act of adultery." There could scarcely be more discrediting facts arrayed against the credibility of his testimony, and when there is added to this the testimony of the defendant and her son that no such occurrence happened, we are bound to conclude that if the trial court accepted the testimony of this witness and upon it convicted the defendant, it was clearly erroneous and unauthorized.

But if it should be admitted that plaintiff's testimony in its entirety was sufficient to authorize a finding that the defendant was guilty of the adultery charged and that her conduct had been so lewd and lascivious as to prove her unchaste, it would not follow that the plaintiff should have been granted the divorce which the court gave him, if he himself was guilty of conduct furnishing grounds

for divorce to his wife, for it is a principle lying at the foundation of equitable procedure that no one shall receive relief unless he approach the forum with clean hands, and this rule is not confined to strictly private transactions alone, but extends to relationships forming a social status as between themselves and one in which the public is concerned. When applied in the procedure looking to a dissolution of the marriage contract it is called in the law "Recrimination." It had its foundation in the Mosaic law. Deuteronomy, chapter 22, verses 13-19, inclusive; and in later times and under a different dispensation another, about whom it is written that, "never man spake like this man," said: "He that is without sin among you let him first cast a stone at her," impliedly saying that he who is *not* without sin shall *not* cast a stone at her. In Bishop on Marriage, Divorce and Separation, the doctrine of recrimination in divorce suits is extensively treated in Vol. 2, chapter XI, sections 337-409, inclusive. In section 338 it is said: "Universally, in England and this country, recrimination is accepted as a valid answer to a suit for divorce." And in section 340, it is said: "Recrimination in divorce law is the defense that the applicant has himself done what is ground for divorce either from bed and board or from the bond of matrimony. It bars the suit founded on whatever cause, whether the defendant is guilty or not." And in section 344 it is said: "A view adequate for our present elucidations is that, extending through our entire law, yet variously modified according to the particular issue, there is a rule which forbids redress to one for an injury done him by another, if himself in the wrong about the same thing whereof he complains. And it will not avail the plaintiff that he is less in fault than the defendant; he must come into court, as the expression is, with *clean hands*." In section 346, applying the "clean hands" doctrine, especially to divorce suits, the learned author says:

"The doctrine which is thus seen to extend through the entire field of our jurisprudence prevails therefore in the divorce law. If in the former it is a little variable and in some respects its exact form and proportions are uncertain, so in the latter there are or have been judicial doubts and conflicts concerning it, and some differences

created by legislation. But in a general way the doctrine is everywhere recognized.''

And again in 349, it is said:

''If we view marriage as a contract, then if a plaintiff comes into court alleging that the defendant has done what entitles him to have the contract partly or fully set aside by a divorce from bed and board or the bond of matrimony, whereupon the defendant shows that the plaintiff is equally subject to a like decree, whether because of the same form of the breach of contract or any other, the thing complained of on the one side and set up in defense on the other being that the other party has broken the mutual marriage contract, the plaintiff stands before the court as himself in fault about the same thing for which he asks redress, he does not come into court with clean hands, consequently he is not entitled to relief. And if we substitute the word 'status' for 'contract,' in this proposition, it will be equally sound in our jurisprudence and in common sense. Such is believed to be the true law of the subject, not derived simply from the decisions in divorce causes, but adhering in our entire legal system.''

Nor is it necessary that the recriminatory acts be of the same character and furnish the same grounds for divorce as those which they are intended to offset, as is shown by the work just referred to, wherein, in section 351, it is said that cruelty is a valid defensive plea to a charge of adultery, and the same is true as to adultery being a bar to a charge of cruelty. Sections 352-355. In other words it is clearly shown by the author of that work to be the law universally recognized, especially by American courts, that any ground authorizing the granting of a divorce may be used by the defendant, by way of a recriminatory charge, to defeat a suit for divorce based upon any other legal ground, and when both parties are shown to be guilty, neither should be granted an absolute divorce. In volume 9, R. C. L. 387, in further substantiation of the doctrine under consideration, the text says:

''It is a general principle of the common law that whoever seeks redress for the violation of a contract resting upon mutual and dependent covenants, to obtain success must himself have performed the obligations on his part. Something analogous to this principle is found

in the doctrine of recrimination, or *compensatio crimi-num,* which was originally borrowed from the canon law, by which the defendant in divorce proceedings is permitted to contest the plaintiff's application on the ground of his own violation of the marriage contract—to set off, to use the language of the cases, the equal guilt of the plaintiff. The doctrine of recrimination by the defendant as a defense in bar of the plaintiff's relief has become fully established in this country, and though misconduct of the plaintiff, such as adultery, occurs after the commencement of his or her suit, it is as fully effective to bar the right to a divorce therein as if it had occurred previous to the commencement of the suit.''

In support of the statement that the doctrine ''has become fully established in this country,'' the following cases are referred to: Conant v. Conant, 10 Cal. 249, 70 Am. Dec. 717; Gordon v. Gordon, 141 Ill. 160, 30 N. E. 446, 33 A. S. R. 294, 21 L. R. A. 387; Decker v. Decker, 193 Ill. 285, 61 N. E. 1108, 86 A. S. A. 325, and note 55 L. R. A. 697; Christianberry v. Christianberry, 3 Blackf. (Ind.) 202, 25 Am. Dec. 96; Burke v. Burke, 44 Kan. 307, 24 Pac. 466, 21 A. S. R. 283; Day v. Day, 71 Kan. 385, 80 Pac. 974, 6 Ann. Cas. 189 and note; Cumming v. Cumming, 135 Mass. 386, 46 Am. Rep. 476; Morrison v. Morrison, 142 Mass. 361, 8 N. E. 59, 56 Am. Rep. 688; Von Bernuth v. Von Bernuth, 76 N. J. Eq. 487, 74 Atl. 700, 139 A. S. R. 784; Smith v. Smith, 4 Paige (N. Y.) 432, 27 Am. Dec. 75; Mattox v. Mattox, 2 Ohio 233, 15 Am. Dec. 547; Church v. Church, 16 R. I. 667, 19 Atl. 244, 7 L. R. A. 385; Mathewson v. Mathewson, 18 R. I. 456, 28 Atl. 801, 49 A. S. R. 782; Hale v. Hale, 47 Tex. 336, 28 Am. Rep. 294; Hubbard v. Hubbard, 74 Wis. 650, 43 N. W. 655, 6 L. R. A. 58, 12 A. S. R. 878; 39 L. R. A. (N. S.) 1135; Ann Cas. 1912C 24. To the same effect is 14 Cyc. 630-631. In the case of Decker v. Decker, *supra,* reported in 86 A. S. R. 325, Mr. Freeman has an extended note upon the doctrine of recrimination now under consideration, and on page 336 of that volume he says:

''It is a rule of universal application that in reply to an application for divorce on the ground of adultery of the defendant, he may allege, either by way of recrimination or cross-petition, the commission of adultery by the plaintiff and if the charge is sustained as to both of the parties, the suit must be dismissed, provided, of

course, there has been no condonement. If both parties have a right to a divorce, neither has," and to this statement there is appended a long list of cases from many of the states. Our own court has in an indirect way recognized the doctrine in Evans v. Evans, *supra,* and Beeler v. Beeler, *supra.*

This principle we regard as eminently just, for if the spouse who is seeking a release from the bonds of matrimony is himself guilty of the same charge which he makes or of another equally efficacious in dissolving such bonds, he should not be permitted to alter his status and to be relieved of the burdens thereof and to thereby deprive the other spouse of whatever benefits that may accrue, either in a social way or from or growing out of property rights, inchoate or otherwise, by a continuance of the relation.

Briefly examining now the charges which the defendant preferred against the plaintiff, the testimony shows that from an early date the plaintiff's treatment of the defendant was cruel, rough and wholly inconsiderate. She worked like a slave, and the meager clothing which she and the children received, aside from their every day wear, was purchased principally with money earned from the sale of butter, eggs and other commodities provided by the defendant. On a number of occasions the plaintiff inflicted physical injuries upon the body of defendant, by striking her at least once with a stick and sometimes with his fist, and upon one occasion he pulled out part of her hair. The children were the frequent recipients of their father's wrath, and when the mother protested she shared their punishment. This continued, according to the testimony of the defendant and three of the children—and denied by no one, since plaintiff did not go upon the stand—until the wife moved with her children to Danville. Plaintiff grew very cold after that time, and upon one occasion before the alleged affair with J. H. Smith, when he was at the Danville home, because some young school children were making a noise in a neighboring yard he accused his daughters and wife of running a "whore house," and subsequently wrote letters to his daughters in which the same charge was stated. It is true that the letters were after the alleged affair with J. H. Smith, but according to the authorities, *supra,* if they were unfounded and malicious they at

least furnished evidence of cruelty as much so as if made prior to that time, and that such unfounded charges are competent on a' charge of cruelty has been many times announced by this and other courts. Kefauver v. Kefauver, 22 R. 386; Bishop on Marriage Divorce and Separation, vol. 1, section 1569; Cyc., vol. 14, page 606; Rogers v. Rogers, 13 Ky. Law Rep. 526; Barlow v. Barlow, 28 Ky. L. R. 644, and 9 R. C. L. 345-6. From this testimony, which, as we have said, is undenied, there is no escape from the conclusion that the charge in the counter-claim of cruel and inhuman treatment was established.

About the middle of 1915 Eula Sergent, *alias* Howard, came to live in plaintiff's house in Harlan county, in which there also lived a man and his wife with two or three children. The Sergent or Howard woman was a divorced widow, about twenty-three years of age, and Noble Smith, while on a visit to his father that summer, testified that he saw plaintiff in bed with that woman. Another witness testified that in passing plaintiff's house he saw through the window plaintiff and the woman caressing each other in plaintiff's room, and as he thought plaintiff had the woman sitting in his lap. Other witnesses testified that they were seen frequently together about the neighborhood, sometimes riding horseback and at other times walking. After the woman left plaintiff's house he was seen frequently about the places to which she moved, engaged in conversation with her, and within one week from the granting of the divorce (a fact which we learn from the motion to modify the judgment) she and the plaintiff were married. It does not require a keen imagination to surmise that the hiring of the nephew, J. H. Smith, was in preparation for this event, so that plaintiff might be relieved of the burden and responsibility of caring for and looking after the children, and at the same time to exchange his tired and exhausted wife for a younger and more attractive woman.

The reputation of Miss Sergent, or Howard, for chastity is assailed by the testimony of a number of witnesses. None of these facts is denied by the plaintiff, as he did not testify, but the woman denies all of them and says that the subject of marriage was never mentioned between them, although, as we have seen, it occurred within

a week after the granting of the divorce. She admits, however, that upon one occasion the plaintiff attempted to hug and kiss her, but that she declined to let him do so. There are other facts and circumstances connected with the relationship of the plaintiff and the woman in question sufficient to at least raise a strong suspicion that defendant's charge against him of living in adultery with her was true. Under the doctrine of recrimination, which we have heretofore discussed, if for no other reason, it is manifest that the court should not have granted the divorce to the plaintiff, and if he thought that the charges preferred against the defendant were true, he should have at most granted only a divorce *a mensa et thoro,* for it must also be remembered that if the twig was bent the plaintiff was the first one to bend it. In such case it would have been the duty of the court to make proper alimony allowances to the wife. Burns v. Burns, *supra,* and cases therein referred to. Although we have no right to reverse the judgment of divorce, we are not prevented from correcting the judgment with respect to alimony and the allowances made for the benefit of the infant children, as well as that made to defendant's attorneys. As stated in the Burns case, and others referred to therein, there is no fixed rule as to the amount to be allowed in such cases. The proof here shows that the land only of the plaintiff is worth at least three hundred thousand or four hundred thousand dollars, some witnesses placing it as high as six hundred thousand dollars. This does not take into consideration other property which he possessed. It is shown that he is now reaping royalties from the operation of some character of mines upon his land, but the extent of this is not shown nor is there anything informing us as to the amount of the royalties which he is receiving. Enough, however, is shown to authorize us to fix a reasonable allowance to be paid monthly to the defendant and to each of the children during infancy, and which, according to all the cases, should be sufficient in amounts to enable the beneficiaries to live comfortably, their station, needs and circumstances considered, and considering, also, the ability of the plaintiff to pay. We have concluded that perhaps it would better subserve the interests of the family, including the defendant, that she be paid a monthly allowance instead of a lump sum as

alimony, and that two hundred dollars per month for her, and seventy-five dollars per month for each of the infant children until they become of age is, under the facts of the case, reasonable and moderate. We are further of the opinion that the allowance of seven hundred and fifty dollars to defendant's attorneys was too small. Considerable proof was taken at different points and upon different dates, and under the circumstances we have concluded that a fee of one thousand dollars, to be paid to the defendant's attorneys, is extremely reasonable.

It is therefore ordered that the judgment concerning the allowances to the defendant and her children and to her attorneys be modified, as herein indicated, and that plaintiff, in addition to furnishing the residence at Danville, be required to maintain it in repair and keep it insured for the use of the defendant and her children until they become of age, with the privilege of the adult ones living with her after that time, with defendant's consent, and with the privilege of herself occupying it until the further orders of the court, and this to be effectual from the date of the judgment below.

Wherefore the judgment is reversed with directions to enter a judgment consistent herewith.

Judge Sampson dissenting.