## Horton v. Horton.

Nov. 4, 1938.

CHESTER D. ADAMS and PAUL H. MANSFIELD for appellant.
STROTHER KISER for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming in part and reversing in part.

On March 24, 1934, appellant filed petition asking absolute divorce from appellee, on the ground of such lewd and lascivious conduct as proved her to be unchaste. Section 2117, subd. 3, Kentucky Statutes. He

alleged that she was not a proper person to have the care of the infant girl, and sought the court to award him such custody.

Shortly thereafter, appellee filed answer in which she denied the allegations of the petition, and in counterclaim, alleged that although appellant was fairly well-to-do in this world's goods he was niggardly and miserly, forcing her at times to do menial labor, so that she could have some of the necessities and many of the "little luxuries"* of life that she and their child were entitled to have. She alleged that she was a fit person to have the future care, control and custody of the infant girl, and appellant unfit to do so. She asked for a divorce from bed and board and for the child's custody.

Her pleading set up the statutory ground of such cruel and inhuman treatment as evidenced a settled aversion. Kentucky Statutes, Sec. 2117, subd. 2. In a later amended answer and counterclaim, based upon the same alleged grounds, that is, cruel and inhuman treatment, she asked for an absolute divorce and an award of alimony.

Appellant replied, denying the affirmative allegations of the answer, which was controverted. The case appears to have been submitted on October 13, 1934, but for some reason judgment was not rendered prior to March 26, 1936, when appellee moved to be permitted to file an amended answer and counterclaim, which was tendered two days later. In this she plead that by certain acts and doings of appellant he had condoned any alleged immoral or reprehensible acts on her part. On April 1, 1936, appellant demurred to and answered her amended pleadings, denying condonation. These filings were on April 4, 1936, and on October 9, a second amended answer and counterclaim was filed, in which appellee withdrew her prayer for divorce mensa et thoro, and asked absolute divorce and alimony, and claiming restoration of certain property.

Demurrers and replies completed the issues, and on May 15, 1937 (as of April 4, 1937) plaintiff's petition, in so far as it sought absolute divorce, and so much of defendants' counterclaim as sought absolute divorce were dismissed. Then plaintiff and defendant each were granted divorce from bed and board, both objecting and excepting. The cause was referred to the com-

missioner for further proof concerning the financial situation of the plaintiff, and the needs of the defendant, and to report what allowance, if any, should be made for her support.

It seems that the child had theretofore been placed in school, and the chancellor indicated that at the end of the year he would make proper and necessary orders for her care. Both parties, under the order, were permitted to visit the child so long as neither undertook to poison her mind against the other, and the court held the case on the docket for the purpose of further orders as to the child's welfare.

It was also ordered that defendant be allowed the sum of $750 as compensation for her attorneys in representing her in the suit, same to be taxed as costs. To this allowance both parties objected; appellant because he thought it was excessive; appellee because of the inadequacy. There were timely and proper objections and exceptions to the court's orders denying divorce, and both parties have appealed, each insisting that the proof shows him or her entitled to an absolute divorce.

The parties to this unfortunate domestic controversy were married in 1926. Both had been previously married. Appellee had secured a divorce from a former husband; appellant's wife had died. Each had one child of the former marriages, both girls, now in young womanhood. A girl child was born of this marriage in 1929. All the children lived in the home with the parents.

Appellant, about fifty-eight years of age, is an energetic, hard-working man; he had been employed by the same railway company for thirty-five years, or more. He was thrifty, and of a saving disposition. The court below indicated that he was penurious, and this seems to be true, but it is evident that he was so because he desired to lay by stores enough to support his family properly, and take care of himself and wife in later years. His work, which required his absence from home from Monday to Friday, earned him wages running from $175 to $235 per month. From his wages and rentals he had managed to purchase considerable property, apparently of the cheaper class. He owned thirty or more houses in and around Lexington, which he rented. The total of his property is estimated at some-

thing like $25,000. His profits were not great, as we note in 1936 he made an income tax report, but paid no tax.

After their marriage the parties lived in less pretentious quarters, until appellant bought a home in a better residential section of Lexington at the price of $11,500, most of which had been paid for at the time of the trial of this suit. He owed small amounts on other properties. It is apparent that after the removal to this home the trouble began, or increased, finally leading to a situation which made it impossible for the parties to continue what had apparently been a contented, if not a happy, life.

At this point we shall make reference to a rather comprehensive opinion of the chancellor, which is a part of the record. The chancellor observed that he had read the entire evidence twice, and perusing his opinion we are constrained to believe that he gave it careful scrutiny and full consideration. The chancellor said:

"* * * The facts and circumstances upon which the plaintiff relies to establish his charges * * * grow out of the association of the defendant with one Logan. Much time has been given to a discussion of the effect that should be accorded the testimony of paid detectives, and much reliance is had upon Smith v. Smith, 181 Ky. 55, 203 S. W. 884, to show that such testimony should be regarded by the courts with suspicion. * * * So far as this case is concerned it is unnecessary to base a finding as to the conduct of defendant on the testimony of the detectives. It is a striking fact that practically everything the detectives testified to was admitted by the defendant herself."

The testimony referred to by the chancellor was substantially as follows: In December, 1933, the appellant, who had theretofore suspected that his wife was acting unbecomingly, and at the suggestion of an attorney, employed two detectives who thereafter watched the movements of the wife in and about the city. This they did from the time of their employment, with the exception of perhaps a month, until in March, 1934. Shortly before this time Logan had rented an upper room in the home of Mrs. Roche on Market Street.

During their vigils the detectives frequently saw

appellee in company with Logan, most of the time in his or her automobile, and frequently observing what the watchers thought were suspicious moves. Appellee on several occasions used Logan's car, and attended picture shows with him. The detectives detail nothing during these various observations which, alone, would sustain the statutory charge.

When this place was rented from Mrs. Roche, appellee looked after the cleaning and proper arrangement of the curtains and furniture, and was seen there frequently by Mrs. Roche, who had gained the impression from Logan that appellee was his sister. Appellee was frequently seen about the room where she cooked, and did laundry work, sometimes remaining as late as 8 p. m.

On the afternoon of March 19, and after the detectives had made periodic reports to appellant, the three stationed themselves in a room directly opposite Logan's quarters. In the afternoon, around 3:20 Logan came to his room; changed his clothing and left. During his absence appellee drove up; parked her car, and went to his room. Shortly thereafter Logan returned, remained a short time, left and returned again to the room. Appellee then proceeded to prepare a meal, which they both ate. Appellee then washed the dishes. Logan was seated in a chair, and after the table had been cleared appellee sat in Logan's lap, and some caressing and fondling followed. Shortly afterwards appellee pulled the blinds down, and she and Logan remained in the room for about three-quarters of an hour.

Appellee admits most of the above recital, denying, however, that she sat in Logan's lap, or that there was any caressing, and that anything out of the way occurred while she was in the room. She says that she was there solely for the purpose of arranging the room, cooking the meal and washing the dishes, which she says happened on various occasions, always attended by the greatest decorum.

Appellee admits that she met Logan at various times and places; that she had gone driving with him in his car; that she saw him three or four times a week; that she had furnished him (along with her brother) many meals in her home, always when the husband was away on his railroad job. She admits that she saw Logan at

intervals after the divorce suit was filed. There is some proof, though not clear, that Logan had a key to the Horton home.

Commenting on this phase of the testimony, and in answer to the criticism of the evidence given by paid detectives, after pointing out appellee's admissions of the frequent visits to Logan's quarters, and of their being seen together at frequent places and intervals, the court said: "Not only are the detectives corroborated by the defendant in this particular, but by Mrs. Roche, the owner of the property."

Mrs. Roche testified, as stated above, as to appellee's visits to the room. She also says that on the night of March 19 some one (and it was one of the detectives) called her and told her what they had just observed. She went to the room and made objections to its use in the manner detailed. She said both parties were dressed, but the bed clothes were thrown back from the bed, and both parties were more or less perturbed, particularly appellee, who left immediately.

The chancellor then resumes, and states that he is fully satisfied, from the proof, that there was more in the relationship than the mere furnishing of food, laundering and other menial services. Yet, he says, "The court is bound by the decisions of the Court of Appeals on this question, to hold that plaintiff has failed to prove his charge of lewd and lascivious conduct," and cites Beatty v. Beatty, 151 Ky. 547, 152 S. W. 540; Miller v. Miller, 229 Ky. 436, 17 S. W. (2d) 412; Grove v. Grove, 239 Ky. 32, 39 S. W. (2d) 193; and McCubbins v. McCubbins, 232 Ky. 698, 24 S. W. (2d) 573, as being indicative that the proof here was not sufficiently strong to support the charge.

We have examined the cases referred to, and find that none of them undertake to lay down any hard and fast rule for the measurement of the weight to be given such testimony. In the cases cited we found the proof insufficient, because of its questionable character, in some instances, given by relatives who admitted bias; in some instances by persons who were not worthy of belief. In others, while the testimony showed acts of indiscretion on the part of the wife, there was lack of proof of any incriminating act on her part; in another case lack of proof of "any uncompromising attitude."

In another there was not a scintilla of incriminating evidence, "except that of Donham," which the court rejected.

It is not necessary to point to numerous cases in which we have held the proof sufficient to sustain the charge under the statute. We may, without quoting, refer to the cases of Vallandingham v. Vallandingham, 232 Ky. 123, 22 S. W. (2d) 424; Yeary v. Yeary, 233 Ky. 691, 26 S. W. (2d) 536.

The statute does not require proof of an act which would constitute adultery. The proof should be such as to authorize the court to believe that the conduct indulged leads to the conclusion that the offending one is unchaste.

> "* * * the statute, as well as justice and the demands of society, require that a wife shall so deport herself as to make the atmosphere of the home over which she presides pure, moral, and upright, and not to pollute it with such conduct as is denounced by both divine and human law, and to the further end that her offspring, if any, will have an opportunity to be reared with pure instead of contaminated environments." Vallandingham Case, supra, 22 S. W. (2d) 426.

We, like the chancellor, are satisfied that there was more in the relationship than such as claimed by appellee, but we do not agree that we are bound by any decision referred to, to hold that the appellant's proof was insufficient to sustain his charge. We think it was, and so hold.

The court also found from the proof (admitting the charges of appellant as proven, though not sufficiently) that he had condoned any misconduct on the part of appellee by occupying the same room and bed with her on the night succeeding the night when he, with the detectives, had made the observations related. Appellant states positively, and appellee does not claim otherwise, that there was no act of cohabitation.

A review of the pleadings will show that the plea of condonation was not made until some two or more years after the institution of the suit, in which appellant first laid his charge of misconduct. It may be, as

argued, that appellee had little faith in her plea, particularly so when it is shown that for quite a period of time after proceedings were begun, the parties lived in the same house, "just across the hall" from each other, thus offering further opportunity for condoning acts, though none claimed. The court quoted part of section 2120, Kentucky Statutes, which recites: "Cohabitation as man and wife, after a knowledge of * * * lewdness complained of, shall take away the right of divorce therefor."

There is not sufficient evidence to the effect that there was, or was intended to be, a resumption of marital relations after appellant had become satisfied of his wife's infidelity. Condonation, as defined by the courts (and indeed as defined by the statute), carries always the idea of complete forgiveness, and must be shown by such proof as would indicate an intent to forgive and a forgiving of the act charged.

"Forgiveness which is to take away the husband's right to a divorce must not fall short of reconciliation, and this must be shown by the reinstatement of the wife in her former position, which renders proof of conjugal cohabitation, or the restitution of conjugal rights, necessary." 9 A. & E. Ency. 2d Ed., 822, and quoted in Truitt v. Truitt, 154 Ill. App. 242.

It has been held in many cases in other jurisdictions, that residing in the same house, and even in the same room, absent proof of marital relations, is not sufficient to constitute an intention to forgive the charged dereliction. Sayles v. Sayles, 41 R. I. 170, 103 A. 225; Rudd v. Rudd, 66 Vt. 91, 28 A. 869; Toulson v. Toulson, 93 Md. 754, 50 A. 401. The proof adduced here is not sufficient to show condonation, or any intention on the part of appellant to resume marital relations with appellee, hence we must, and do disagree, with the conclusions of the chancellor on this phase of the case.

We come now to the other side of the case, that is, the counterclaim of appellee based on cruel treatment, and her insistence that her proof on this point was sufficient to justify the granting to her of an absolute divorce.

Some argument is advanced, though we do not think

seriously, that appellant was guilty of cruel and inhuman treatment, because of his unsustained charge of misconduct. The chancellor disposed of this contention, (as we have done) saying:

"While it is true that where a husband, without any grounds, accuses his wife of adultery, he is guilty of cruel and inhuman treatment. The mere fact that such charge is inadequately proven, does not ipso facto entitle the wife to a divorce on the grounds of cruel treatment. * * * Sallee v. Sallee, 213 Ky. 125, 280 S. W. 932."

The chancellor found, without seeming difficulty, that the charges here were not "groundless," or intentionally falsely or maliciously made, "hence appellee could not avail herself of that rule in this particular case."

As to her contention, based on charges other than the one just mentioned, we agree with the chancellor in his conclusions. The record shows, and the chancellor found, that for some time after the marriage of the parties their life was one of contentment. Appellant had confidence in his wife, to the extent that he had merchants to extend credit for goods purchased by her. He made reasonable allowances for spending money, mostly for necessities, it is true. He went so far as to entrust her with the purchase of several pieces of real estate for him, though complaining in some instances because he thought she had paid too much.

However, appellant later learned that appellee had taken to betting on the races, and this was so much to his distaste that he began to "tighten up" on his allowances, and the credit freedom, which she had theretofore enjoyed.

The chancellor dismisses in a few words appellee's contention that her conduct (not misconduct), that is, her association with Logan, and rendering menial services to him, was due solely to her husband's failure to supply her with sufficient funds to purchase necessities, as not being sufficient to condone her behavior. On the question of cruelty, the chancellor said:

"One of the main causes of the breach between these parties was the wife's persistent betting. While she contends that she placed few bets, it is a matter of common knowledge that most persons in

discussing such, tend to minimize their bets and losses. Plaintiff had a right, both legally and morally, to forbid the plaintiff to place the money he had earned, on horse races. Plaintiff is a man of limited education, hard-working, of undisputed honesty, and not without a sense of his duties to the members of his family. He is frugal, even to the point of being stingy, but the court after a careful examination of the evidence, cannot characterize his conduct toward the defendant as habitually cruel and inhuman, and without fault on her part. At most we could only say that he was so unfortunate in not knowing how, or possessing the willingness to show and exhibit more of the finer considerations of thoughtfulness and affection to produce joy and happiness in his home. But his deficiencies in these regards do not appear to be anything more than temperamental, and as such may be classified as unfortunate, rather than purposeful or deliberate.''

Continuing, the court pointed out two or three seemingly trivial matters about which appellee complained, but dismissed them with the observation that one was entirely due to a misunderstanding on the part of appellant, the others due to the fault of the appellee, and we are of the opinion that he was correct in his conclusions, and fully agree with the chancellor that on the showing made by appellee, her counterclaim for absolute divorce must fail.

On the question of allowance to counsel for appel lee for services rendered, we agree with the court that in so far as any showing to the contrary was made, the allowance was adequate, and not too large as claimed by appellant. The chancellor was familiar with what had been done by counsel, and was in a position, perhaps better than this court, to measure the compensation. We are not prepared to interfere with his ruling on this phase of the case. See recent cases collated under 7 Kentucky Digest, Divorce 227 (2).

On the whole case, realizing full well the rule in regard to the chancellor's ruling on questions of fact, we must say that it is our opinion that appellant has by his proof sufficiently shown that he is entitled to an absolute divorce, and that the court correctly ruled that appellee had failed in her showing.

Since the court below has reservea for future consideration the question of allowance to the appellee, or to the child, and the custody of the child, we refrain from attempting now to pass on any of these questions, and as well do not undertake to pass on any claimed property rights or adjustments set up by appellee, but not adjudicated.

The case is reversed on appellant's appeal, in so far as the matter of divorce is concerned, with directions that he be granted an absolute divorce. It is affirmed on so much of his appeal as relates to allowance of attorney's fees. It is affirmed on appellee's cross appeal in all respects.