HULETT *v.* HULETT.*

(Division B. Dec. 22, 1928. Suggestion of Error Overruled Jan. 21, 1929.)

[119 So. 581. No. 27331.]

478

480

*Corpus Juris-Cyc. References: Divorce, 19CJ, section 93, p. 52, n. 79; section 237, p. 99, n. 62; section 317, p. 120, n. 6; section 338, p. 128, n. 55; section 339, p. 129, n. 64, 65; section 340, p. 130, n. 77; section 475, p. 192, n. 16; section 481, p. 195, n. 40; section 568, p. 246, n. 94; section 801, p. 347, n. 54; Evidence, 23CJ, section 1792, p. 48, n. 44; p. 49, n. 48; p. 50, n. 56; Witnesses, 40Cyc, p. 2196, n. 11; p. 2694, n. 10; On right of third persons to intervene in divorce proceedings, see 9 R. C. L. 408.

*Currie & Amis* and *F. E. Richardson,* for appellant.

*Jacobson & Cameron,* for appellee.

484

486

Orally argued by *J. H. Currie,* for appellant, and *Gabe Jacobson,* for appellee.

ETHRIDGE, P. J.  We regret the necessity of writing in this case, for the sake of all the parties concerned, and especially of the small child involved.  We dislike to set out the facts in the case to be published in the reports; but because of the exclusion of certain evidence bearing on the issues, which we think should have been admitted by the chancellor, it is necessary to make a statement of the case, and of the evidence tendered and rejected, and of some of the other pertinent facts by which the materiality of the rejected evidence will become apparent.

The appellant filed a bill in the chancery court for a divorce from his wife, the appellee, charging her with adultery with a number of men, and with conduct unbecoming a married woman, which tended to prove that she was of an adulterous disposition, and unmindful of her martial obligations.

It is alleged in the bill that the defendant, the appellee, did many things of which the husband, the appellant, did not approve, and that he remonstrated with her from time to time; that he objected to her association with certain persons, and repeatedly protested against the appellee's habit of smoking and drinking—sometimes drink-

ing to excess. It is charged that during the early part of 1927 complainant was advised that not only was his wife associating with certain companions to whom he objected, but she was receiving very marked attentions from various men, both married and unmarried, and meeting such men and going for long drives on country roads leading into the city of Meridian, and receiving such men at her home, and at other places; the complainant was deeply resentful of such reports, and disinclined to believe them; but in March, 1927, he was advised that his wife was being paid very particular attention by one unmarried man in the city of Meridian, and received notices from sources which he could not disbelieve that she was frequently with this man, as well as others, in secluded spots on off-roads in and near the city of Meridian; that on March 24, 1927, complainant was advised that the defendant was to meet a certain man by appointment on a road near Meridian, and as a matter of fact, had left her home for that purpose. Thereupon, complainant went in a car, accompanied by a friend, to the place indicated, where he found the car which he had purchased, and which was used by his wife, parked on the roadside, while the car used by the man in question was parked near by, both his wife and the man being in complainant's car. It was alleged that at such time and place defendant committed adultery with the man. Complainant, upon finding the conditions aforesaid, returned his wife to their home, and left her, and has not since had any communication with her, except to deposit money for the use of defendant, and their child by said marriage, as had been his custom prior to said act.

After this occurrence, in connection with which the man in question was shot by the complainant, the matter was noised about the city, and other information was conveyed to complainant thereafter which indicated that his wife was guilty of immoral conduct on various occasions, and with several different men. It was alleged

that in the year 1925 she committed adultery with a man whose name is unknown to complainant, on a road infrequently traveled, leading from Fifth to Eighth street roads, and commonly known among a certain fraternity of the city as "Lovers' Lane." It was further alleged that at various other times, between that time and March 24, 1927, defendant had committed adultery with the same man whom she met on that date, as stated above, in secluded spots along roadways leading into the city of Meridian, the exact dates of said acts being unknown to complainant. That in the latter part of the year 1926 the defendant took long rides on these roads with certain unmarried men of that city; and in the latter part of 1926 and the early part of 1927, the exact dates being unknown, defendant rode with the man mentioned above, in the car owned by complainant, along the roads leading into Meridian, and to secluded spots thereon.

It is alleged by complainant that it was often necessary that he should be at his place of business at night, and that twice in each year he had to go away from his place of business to purchase merchandise; and that while he was absent from Meridian, about his lawful business, the defendant invited certain men, both married and unmarried, to his home, such men going there in the afternoon and evening, and at other times when he was not present, and when he was not in the city, remaining for a hour or more.

A motion for a bill of particulars was filed by the defendant, requiring specifications and names of persons with whom she was alleged to have committed adultery, and of all acts and facts implicating her, on which the complainant relied and expected to prove. This bill of particulars was filed, setting forth in considerable details the charges of the bill.

The bill also charged that the acts complained of constituted cruel and inhuman treatment, and by reason of said acts complainant was entitled to a divorce from the

defendant, and to the custody of his minor son, a child of five years; the defendant not being a suitable person to have charge and control of said child. Complainant states that his mother, and the wife of his brother, both being qualified to have control and custody of a child, are anxious to take the child, and do a mother's part by it.

Defendant filed her answer, denying the allegations of the bill, setting forth in her answer that the complainant and his relatives and friends are wealthy and influential people, complainant being a partner in a large furniture business in the city of Meridian, and in addition to the profits of such business, having a salary of three hundred and seventy-five dollars a month; and that the said complainant and his relatives and friends are socially influential, belonging to numerous fraternities, clubs, and other social organizations; that she was without sufficient means of her own to defend herself, and to develop the facts necessary to her vindication; that it would require much investigation to prepare the case; and prayed that she be allowed reasonable fees to employ counsel to represent her in the suit, and that she be allowed temporary alimony and support for herself and her child, pending the litigation. She denied that she is not a suitable person to have the custody and control of the child, and denied that complainant was a suitable person to have same.

Later she amended her answer, and made it a cross-bill, alleging that by reason of said charges preferred in the bill, and the statement made by the complainant in seeking evidence to sustain his suit, and in discussing the matter with people, that she had been cruelly treated, her reputation injured, and if the charges were believed by all people, she would be excluded from the homes of all decent persons in the city; and prayed a cross-bill for a divorce on account of said charges, and for custody of

the child, and for permanent alimony, including counsel's fees incurred in the litigation of said suit.

It appears from the testimony that on the 24th of March, the complainant, in company with an employ in the Hulett Furniture Company store, having been informed that his wife and a certain unmarried man of the city were meeting on one of the roads leading out of Meridian, went to the point on the road indicated in said information. Upon reaching such point, he found his wife and the young man in the Hulett car, while the car of the company for which the young man worked was parked near by, on the opposite side of the road. Hulett got out of the car, and demanded that his wife and the young man get out of the car in which they were sitting, and when they did so he began to fire his pistol at the man, who ran around the car with Hulett in pursuit, and defendant ran after the man, urging him not to shoot; Hulett's pistol hung, and his companion came up and took it away from him. Thereafter the complainant made his wife and the man get in the Hulett car, which he drove to the home of his wife's mother, turning the man in question over to his employee who had accompanied him to the scene, with instructions to take said man to the hospital. He then informed his wife's mother of what had occurred, took his wife to their own home, and left her.

It appears that on the trip from the scene of the shooting back to the city, both the man in question and Mrs. Hulett undertook to explain the situation to complainant, who refused to permit them to do so; and that when he reached home his wife tried to make him listen to an explanation, and offered to submit to a physical examination to show that she had not been guilty of wrong conduct, but he refused to listen, and left her; and some time thereafter filed a bill for divorce.

After the shooting it was arranged between Hulett's brother of the half blood, and an uncle of such brother,

and an employ, Davis, to go to the place where the car was found early the following morning, for the purpose of investigating the premises and surroundings at such point. This they did, reaching the place shortly after daylight the following morning. The employ, Davis, having been present when the shooting took place, and being familiar with the location of the cars, pointed out where the cars had stood. The Hulett car had stood on the side of the road, within a few feet thereof, as testified to, and the tracks of the car were easily seen at such point, there being only one track showing the kind of tread that the casing of the Hulett car had; and this car track had been out on the road a mile or more, when it turned, and returned to the point where it was situated at the time the shooting took place, a few feet from where the car had stood, in the brush and undergrowth near the road, was found a soiled handkerchief, with a certain article wrapped therein commonly known as a contraceptive, with evidence of having been recently used. Also, there was a man's handkerchief in like condition, except that it did not have such article in it. The witnesses testified that they saw a man's tracks at the point, from the car in which the man rode, and from that place to the car occupied by Mrs. Hulett, and tracks were around the spot where the Hulett car was situated, indicating the movements of the parties at the time of the shooting.

The evidence as to the finding of the handkerchiefs, and other articles, and as to the tracks, was objected to, and the objection sustained by the chancellor.

There was other evidence that on several occasions Mrs. Hulett was in company with the man who was shot by complainant, at the place where the shooting occurred, and on various other roads leading out of the city of Meridian. One of the witnesses, who lived some six or seven miles from Meridian, testified that Mrs. Hulett and the man came out there together several times in a car, the latter part of 1926, or the early part of 1927, parked

the car near their residence, and sat in it for some time; that on some of these visits it was dark, and lights were extinguished in the car; and that on one occasion the man in question and Mrs. Hulett got out of the car and went into the woods late in the afternoon, but the witness passed on.

On another occasion they were seen on the Meridian and Bailey road, some four or five miles out of Meridian, sitting in the car, which was parked on the side of the road.

Another witness testified that on several occasions, when the witness and her man friend were driving on the Collinsville road, they saw Mrs. Hulett and the man in question driving along the road, and that they left the main travelled highway, and went off on unfrequented roads, but that they did not see anything indicating criminal conduct, and did know what their errand was.

Two other witnesses testified that on another occasion, while making a trip along the road leading from the Eighth street road to the Fifth street road, they found a car with no occupants, the car apparently stuck in the mud; that they went on to a nearby point, to fish, and later heard the car trying to pull out, whereupon they went up and assisted in extricating the car from the mud, and with their car assisted it in reaching a garage; they then took the parties who were in the car (two women and a man) to the city; that the two women went to the Hulett home, and one of the ladies remarked that she was darned glad she got home before her husband arrived— the witness could not say which one it was. It appears that Mrs. Hulett, the defendant, and one of her sisters, were in the car at the said time.

It appears that on another occasion, when Mr. Hulett was not at home, his wife, in company with the man in question, and another lady, made a trip from Meridian to Riderwood, Ala., a distance of about thirty-five miles, to a radio party and dance; and on their return the negro

servant, one of the witnesses, testified that she was instructed to clean out the car in which they went, because Mrs. Hulett had been intoxicated to the point of nausea, and vomited in the car. The defendant admitted making this trip, but denied the statement of the negro witness, and also that there had been any drinking, or misconduct of any kind. She admitted some of the trips with the man who was shot, and that she had invited him to go driving in her car with her on some of the occasions, but denied having done so on most of the occasions; and she denied absolutely that any misconduct of any kind had taken place, or that she had been guilty of any misconduct with any one.

The bill of particulars named these parties, residents of Meridian, as persons with whom it·was charged that Mrs. Hulett had committed adultery. Each of these men, over the objection of the appellant, requested leave to intervene in the suit, and to file answers, which were admitted over the objection of complainant, and which answers denied the charges made against them; and these answers were read before the chancellor at the hearing, over objection. This is assigned for error. The rule appears to be that it is not permissible for a person named as co-respondent, and not a party to the suit, to intervene in a divorce suit for such purpose. The rule appears to be that only the parties to the suit are concerned with the issues, and that, in the absence of a statute permitting such intervention, the same is not permissible. *Howell* v. *Howell,* 87 Kan. 389, 124 P. 168, Ann. Cas. 1913E, page 429, and case notes and authorities cited therein.

However, the depositions of each of these men were taken by the defendant, for use in the suit, which depositions were offered in evidence, and contained the same denials as were set out in the sworn answers. This would be harmless error if it were the sole point involved.

The second assignment of error charges that the court erred in refusing to allow the complainant, when on the

witness stand, to testify as to the information received by him, and whether he believed it to be true at the time of filing the bill in this case. It appears that the complainant desired to offer testimony as to the nature of information upon which he acted, and that it was from credible sources, and that he acted upon it in good faith.

In considering this assignment of error, it must be remembered that the defendant had filed a cross-bill, in which she sought a divorce because of the charges made against her in the bill, and other matters, as constituting cruel and inhuman treatment, and that this testimony was offered for the purpose of showing probable cause for believing the allegations of the bill to be true, and that it was not filed without cause, nor was it filed with malice.

We are of the opinion that it was competent for the complainant, under the facts stated, to testify as to the information and acts upon which he based the said charge, and that he believed the same to be true, as going to the issue made by the cross-bill. It appears to us to be sound law that, where there are sufficient circumstances to cause a reasonable man to believe from such circumstances and information that his wife was guilty of such charge, he may file his bill in court to dissolve the marriage, and he would not be penalized by the fact that the proof produced on the trial did not convince the court that the issues of the divorce case were made out; but if the court believes that, situated as he was at the time of filing the bill, and considering the nature and sources of his information, it was sufficient to make a reasonable person believe that the charges in the bill were true, it would not constitute cruelty within the meaning of the statute making habitual cruel and inhuman treatment a ground for divorce.

This proposition is well discussed in the Kentucky court of appeals in *Sallee* v. *Sallee,* 213 Ky. 125, 280 S. W. 932 et seq. In the sixth syllabus to that case it is

said: "For accusations made by husband in pleading as to lewd and lascivious conduct on part of wife to constitute cruel and inhuman treatment, it should be demonstrated that they were groundless, and were intentionally, falsely and maliciously made." In the seventh syllabus it was held: "Charge of lewd and lascivious conduct on part of wife made in husband's answer held not cruel and inhuman treatment, where under the evidence, facts within husband's knowledge were sufficient to authorize him to make such charge." On page 934, in 280 S. W., second column (213 Ky. 131), it is said: "Fact 3 has often been held by us as sufficient proof of the statutory grounds under consideration. *Smith* v. *Smith*, 203 S. W. 884, 181 Ky. 55, and other cases and authorities therein cited. But, in order for such accusations, made in a pleading, to have that effect, it should be demonstrated that they are groundless and were intentionally, falsely, and maliciously made. It has never been held by this or any other court, so far as we are aware, that a husband might not in good faith and upon reasonable information prefer such a charge without subjecting himself to the penalties of the statute and thereby giving his wife grounds for divorce when she otherwise had none. To so hold would subject every husband to the charge contained in the statute if he should fail to prove to the satisfaction of the court the truth of the accusation."

In *Barton* v. *Barton*, 97 N. J. Eq. 404, 128 A. 798, in the chancery court of New Jersey, it is held in the syllabus as follows: "To accuse wife of adultery is not extreme cruelty *per se*, but accusation must be false or maliciously or wantonly made, and be visited on her or come to her notice, causing anguish and pain, and false accusation is not extreme cruelty if made under stress of reasonable suspicion caused by wife's conduct, especially where wife did not raise such cruelty in her original petition."

In *Sample* v. *Sample*, 82 Neb. 37, 116 N. W. 953, the supreme court of Nebraska held: ''Whether accusations of infidelity made by one spouse against the other constitute extreme cruelty within the meaning of the statute must be determined by the facts of each particular case. In no case will they be given that effect unless they are shown to be either unfounded or malicious.''

It is said by the appellee, in justification of the ruling of the chancellor, that cruelty was to be judged by the effect produced, and not by the motive or intent of the person inflicting the treatment, or doing the act constituting cruelty, citing and relying upon the case of *Mc-Neill* v. *McNeill*, 125 Miss. 277, 87 So. 645, in which the court held that: ''In an action for divorce based upon habitually cruel and inhuman treatment, in order that the complaining party may be entitled to relief, it is not necessary that the acts of alleged cruelty shall be, in fact, menacing to the life or health of complainant; but, if the alleged acts of cruelty are such as to create in the mind of the complainant a reasonable apprehension of such danger, relief should be granted.'' It was also held in that action that it is not necessary that acts of alleged cruelty should be malicious, but that such acts are to be judged by the effect produced, and the motives prompting them are immaterial.

The rule announced in that case, as applied to the case then under consideration, is entirely sound. But this court has held that an insane person is incapable of committing cruel and inhuman acts within the statute authorizing divorce therefor, because of the lack of mental capacity on the part of such person to act knowingly and willfully. It is settled in this state that an insane person is incapable of an act of cruelty within the meaning of the statute during insanity, because such deliberate conduct as the law requires is beyond his capacity. *Walker* v. *Walker*, 140 Miss. 340, 105 So. 733, 42 A. L. R. 1525; *McIntosh* v. *McIntosh* (Miss.), 117 So. 352.

Of course, where a rational party deliberately commits an act, the nature and necessary result of which constitutes cruelty to another person, the motive which actuates the deed is not the test, but rather the character of the act, coupled with the person's motive and intention in so doing. The person may intend to bring about good results, and be actuated by high motives in doing a cruel act, or in uttering cruel words; but this alone would not prevent it from being cruelty. But where a person files suit for a divorce because of a given act, or certain conduct, the evidence in regard to which is received from reliable sources, the failure to establish the case will not be allowed to form the basis for an action for divorce against the pleader. The allegations of the bill may not, in fact, be sustained to the satisfaction of the court, and yet the party may have acted in the utmost good faith in asserting a legal right; and the right to resort to the courts must not be too strictly construed.

It was certainly competent upon the issue made by the cross-bill to prove that the filing of the bill was based upon information received from credible sources, which, if clearly proven, would be sufficient to make out the case charged; and the party should be permitted to show to the court the facts relating thereto, and the sources from which the information is derived, and the purpose for which it was used.

We think the chancellor erred in refusing to admit this testimony.

The complainant also objected to the testimony of the witness Edwina Burnett as to a conversation between Mrs. Hulett and Mr. Cross, in which it was claimed that Mrs. Hulett invited the latter to come to her home in the absence of her husband, stating to him that her husband would be away on a certain night. This objection was primarily based upon the fact that this conversation was not set out in the bill of particulars; but the complainant asked leave to amend the bill of particulars and set out

the said conversation therein, which the court refused to allow.

There was no showing that Cross was not available as a witness, or that to get him to deny the said conversation on behalf of the defendant would unduly delay the trial. We think the testimony was competent on the charges made, and unless there was some good reason to believe that the case of the defendant would be prejudiced by failure to get Cross to testify as a witness, or that it would unduly delay the trial to do so, the court should have permitted the bill of particulars to be amended so as to include such evidence.

In *McCann* v. *State*, 13 Smedes & M. 471, 1 Morris St. Cas. 486, the court held that: "In cases depending upon circumstantial evidence, everything which may tend to elucidate the transaction should be admitted."

This proof, taken in connection with other evidence which was admitted, and also with evidence which we think is wrongfully excluded—hereafter to be referred to—will tend to prove the charges in the bill.

In *Houlton* v. *McGuirk*, 122 La. 359, 47 So. 681, 16 Ann. Cas. 1117, the Louisiana court held: "In an action for divorce for adultery, evidence of incidents showing defendant's adulterous disposition, though not connected in time or place with the alleged act of adultery, are relevant to add to the probability or her having committed the acts relied on."

The complainant offered the testimony of a witness named Boles, who was a clerk in one of the hotels in Meridian, to prove that he heard over the telephone a conversation between a woman outside of the hotel, and a guest in the hotel, of such a nature as to attract his attention, because of the unusual nature of such conversation between a man and a woman; and that in this conversation the woman made an engagement for the man to meet her at Niolon's corner, in the city of Meridian, that she would be at the corner in about ten minutes from

the time of the conversation; that the man who was a guest in the hotel came down, and Boles followed him out of the hotel nearly to the corner, where he saw a woman in an Essex car, of which he got the number; he then telephoned to the sheriff's office, where he was told that the car bearing that number belonged to Hulett, the complainant. He was asked if the defendant, Mrs. Hulett, was the woman whom he saw on that occasion, and if, in his best judgment, he would say that she was the woman. Objection was interposed, and the evidence was not admitted.

We think that if the witness testified that in his best judgment the woman was Mrs. Hulett, and that the substance of the conversation was of such a nature as would indicate an adulterous disposition or inclination on the part of the woman, the evidence should have been admitted as a circumstance, to be considered in connection with all the evidence in the case, as having a tendency to maintain the issue made by the pleadings. In such case the court should admit the evidence, and then, at the conclusion of all the evidence, consider it as a whole and determine its sufficiency as a whole, to make out the case. The identity of the woman in question on that occasion may not be made out to a moral certainty, free from reasonable doubt; but the witness should have been permitted to give his judgment in the matter, and his recollection of the appearance of the woman on the occasion in question. Of course, the conversation must have been of an unusual nature, under such circumstances. The mere fact, in itself, that a woman called a man at a hotel and made an engagement to meet him at a given point would not be sufficient; but if the conversation as a whole led to the deduction that the meeting was for immoral purposes, it should have been admitted as a circumstance.

The complainant offered, also, a witness by the name of D. C. Barton, for the purpose of proving a conversation between defendant and Barton, Barton being an

employee of complainant's in the furniture store, that she desired a meeting or appointment with him some time at her home when her husband would be away; that she desired to see what there was to him anyway; also, he offered to prove that during the said conversation the man who was shot at the scene above mentioned came up and was introduced to Barton, this being prior to the shooting, and that after a short conversation the man went on and Mrs. Hulett remarked to Barton: "He is my sweetie; I know where he is most all the time." He offered to prove by Barton that immediately after this conversation Hulett came out of a café or restaurant with his child, and that Hulett and the child got on the front seat of their car, and Mrs. Hulett and Barton were on the rear seat; that Mrs. Hulett took Barton's hand in hers, which conduct so alarmed the latter that he made an excuse, and got out of the car.

We think that this conversation, if held, had a tendency to show that Mrs. Hulett was of an adulterous disposition. For a married woman to say to a single man that she desired to have him come to her house when her husband was away, that she wanted to see what was in him, tended at least to show that she was not entirely true to her marriage obligations.

We also think that for her to say on such occasion to Barton that another man—a single man—was her "sweetie," and that she knew where he was nearly all the time, indicated, or tended to indicate, immorality, especially when considered in the light of other testimony offered in the case some of which tended to show that she was unchaste in character and untrue to her marital obligations.

The complainant introduced a witness by the name of W. T. Wilder, Jr., by whom he sought to prove that when the latter was out hunting on a road known as "Lovers' Lane," an infrequently traveled highway between two leading highways of the city, he saw an Essex

coach drive up, and the man and woman therein got out and went into the woods; that at the time he did not know who the man was; and, when asked who the woman was, stated that he would not like to be positive, as he might be mistaken about it; he was then asked to give his best judgment as to who she was, which question was objected to, and the objection was sustained, and exception taken. Afterwards, when asked whether or not he had seen these people on the ground, he answered, "No." The complainant then claimed surprise, and sought to examine the witness as to whether he had not made such a statement to Mr. Hulett shortly after the shooting of the man above mentioned, and also to a Mr. Semmes at a stated time and place; and if he did not say to these parties, one being the complainant, that the woman was the defendant, Mrs. Daisy Houston Hulett, and while he did not know the man at the time, he afterwards found him to be a Mr. Walter Dement. The questions were objected to, and the objection was sustained. Counsel then claimed surprise, and offered to introduce Mr. Hulett and Mr. Semmes to prove that he also stated to them that he saw the parties in the act of adultery.

We think it was competent to ask the witness if he had not made the statement to Mr. Hulett and to Mr. Semmes, first, for the purpose of refreshing his memory, and, if it were made to Hulett under such circumstances as to lead Hulett to believe that he would testify to it on the stand, it would have been competent to show by Hulett that he did make such statement, and that in calling him as a witness he expected him to so testify on the stand. This, of course, would not be affirmative evidence as to the charges made in the bill, but would be competent on the issue made by the cross-bill. If he filed the bill on information from this witness, which he believed to be true, and which was apparently reliable, in the belief that the witness would testify to the statement in court, it

would certainly tend to show that the bill was filed for probable cause.

The rule in regard to impeaching a witness placed on the stand by a party does not prevent the party from showing that the witness had stated to him out of court the things as being facts, and that he believed, when he placed him on the stand, that he would make the statement.

Bearing on the question, it appears that the witness, after being summoned, had been interviewed by a brother-in-law of the defendant as to what he would testify, and whether he could not have mistaken Mrs. Hulett for one of her sisters. Of course, the only effect of admitting examination would be to show that the witness had not dealt fairly with the complainant, having caused the latter to place him on the stand, where he testified differently from what the complainant expected.

In addition to what we have stated, there was evidence given by a neighbor of Hulett's, a lady, showing that on a number of occasions men had visited the Hulett house in the afternoon and night, at times remaining for a good while, and on some occasions until late at night; that on one occasion this witness got up at night to administer medicine to her child, and looking over at the Hulett home, saw in Mrs. Hulett's room two men and two women; that one of them was putting on her stockings or garters, and that the other woman was putting on some garment over her head; and that they went outside and started to the city. She had also testified that she saw Mrs. Hulett and another woman and two men were in the house at a time when Mr. Hulett was not at home, and the lights were extinguished for a considerable period of time; that it was a frequent practice for cars to park near the Hulett home, and for men to go into the house, in the absence of Mr. Hulett.

It was also proven by the complainant that on the day preceding the shooting Mrs. Hulett went to the house of

a neighbor, and when Mr. Hulett had occasion to go to town for some purpose, and saw the car belonging to the man who was afterwards shot, at this neighbor's house, he drove around, and repassing the house, saw that the car was gone, but on passing that way again the car was again there; and when his wife returned home that afternoon he asked her if the man was at the neighbor's house that day, and she denied that he was.

It was testified by the defendant that she did not make the statement that this particular man was not there; that her husband asked her if Pit-a-Pat was there, and she told him she did not know who that was; at the time she did not know they called him by that name. She further testified that she and the neighbor's wife and the man who was shot drove downtown that afternoon for the purpose of getting some sandwiches and Coca-Cola, in which statement she was supported by these neighbors, who testified in her behalf.

Appellee introduced evidence by a number of her neighbors and friends to show that they had never seen any improper conduct on her part, and that she was an ideal mother, and a lady of high standing, engaged in church work and other charitable undertakings. The proof introduced by her in this respect was by people of high social standing in the city.

We think the evidence that we have commented upon, and further evidence of somewhat similar character, tended to prove the charge of adultery, and if the evidence had been admitted, and weighed in connection with the other evidence, giving it due weight and cogency, such consideration as it should have received in connection with other circumstances in the case, both in affirmation and denial of the charge, the chancellor might have been convinced of the truth of the charge. In 2 C. J. at page 22, section 44, it is said:

"It being evident from the nature of the crime of adultery, that, in the majority of prosecutions therefor, it

can be established only by circumstantial evidence, therefore the general rule is that the crime may be sufficiently established by proof of circumstances from which the jury may reasonably infer the guilt of defendant.

"But the circumstances must be such as will lead the guarded discretion of a reasonable man to the conclusion that the offense has been committed, and should be so cogent as to exclude every reasonable hypothesis except that of guilt. If the facts shown can be reconciled with innocence, they are insufficient to sustain a conviction."

"Sec. 45. In prosecution for adultery it is competent to prove the acts, conduct and situation of the persons charged with the offense."

"It must appear that the acts and conduct, evidence of which is offered, are sufficiently near in point of time and significant in character to have a tendency to establish the offense alleged in the indictment; and in some jurisdictions the admission of such evidence is confined to proof of a continuing offense."

"Sec. 46. Adulterous inclination and opportunity to satisfy it. It had been laid down broadly that proof of an adulterous inclination in the minds of the parties, and of an opportunity to satisfy it, justifies an inference of sexual intercourse. In any event when such inclination is shown to exist between the parties at the time of the alleged act, then mere opportunity, with comparatively slight circumstances showing guilt, will be sufficient to justify the inference that criminal intercourse has actually taken place. Accordingly, it is competent to prove the mutual adulterous inclination of the persons charged with having committed the offense, and any evidence is admissible which tends to show that they had an opportunity to satisfy that inclination. But the inclination must extend to conduct reasonably suggesting a libidinous tendency of each of the parties toward the other, and the opportunity must be more than a mere chance. And to warrant the inference of intercourse, the adulter-

ous inclination and the oportunity to satisfy it must concur.

"Suspicious actions and incriminating circumstances are admissible as showing an adulterous inclination.

"It has been held that the act of adultery may be inferred from evidence that a man and woman occupied the same bed and room, or even that they occupied a room with a bed in it or that they were seen together in bed."

In *Banks* v. *Banks,* 118 Miss. 783, 79 So. 841, it is held that the act may be established by circumstances, but the circumstances must be those within the personal knowledge of the witness; that the proof should be restricted largely to the pleadings, and the parties not required to run the gauntlet of all rumors of the community pertaining to character. We said, at page 787 of 118 Miss. (79 So. 842), in said case: "Where an offense of this kind is sought to be proven by circumstantial evidence, the circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence."

This announcement of a rule is applied to the whole case; when all the evidence is in this rule is invoked, but it is not applicable to each and every circumstance. As stated in the McCann case, above quoted from, in cases depending on circumstantial evidence, everything which may tend to elucidate the transaction must be admitted. That case is ably reasoned on circumstantial evidence, and shows that some circumstances standing alone may be utterly insufficient to make out a charge of misconduct or crime; but when coupled with other facts having a similar tendency, and considering them together, with

their relation and their relation to each other, and to all the other evidence in the case, they may lead the mind unerringly to conviction. As stated, the mere union of a number of independent circumstances, each of which tends to prove the same circumstance, affords a just ground of conviction if the combination be conclusive. Where a great number of facts are combined, it may be impossible to prove all of them beyond a reasonable doubt, though all of them, taken together, may lead to a satisfactory conclusion.

This court has in many cases applied the rule to both civil and criminal cases. It is well known that a large number of coexistent circumstances may tend to a common conclusion, and lend to force much greater in directing the mind to such a conclusion, than a single circumstance, each of them taken alone.

Circumstantial evidence may be likened to the well-known staple of the South—cotton. It may be separated into particles, blown about by the breath, is easily separated or pulled apart, but when it is spun or twisted into a thread, and a number of threads twisted into a strand, and a number of strands into a rope, it may have a terrific strength, and be capable of resisting great force.

Of course, it is the function of the chancellor to consider all of the evidence, and to draw therefrom inferences and conclusions, but where he rejects evidence which is competent, and which tends to prove the issue, we are unable to say what force we would give to the rejected evidence, had he deemed it proper to be considered in relation to the other proven facts.

But the bill alleges both cruelty and adultery as grounds for divorce, and the chancellor found as a fact that the proof was insufficient to show adultery, but was sufficient to show cruelty; however, in the decree he did not state whose allegation of cruelty was sustained by the proof; and it is urged by the appellant that the failure on the part of the chancellor so to do rendered the decree

uncertain and void, and that it is impossible therefrom to determine who was entitled to the relief, or who won the decision.

We are not inclined to agree with this view. When the chancellor does not make a specific finding of facts, then the court must look to the evidence, and see what state of facts, if any, will justify the decree.

In the whole trial the character of appellant, complainant below, was not attacked at all. He was conceded to be a person of high standing and influence in the community where he lived. The proof on behalf of the complainant, whether it is sufficient to establish adultery or not, is sufficient to establish cruel and inhuman treatment, under the statute. The authorities above cited with reference to allegations in the cross-bill for divorce, constituting cruel and inhuman treatment, taken in the light of the facts in this record, fail to make out a case on behalf of the wife. In the absence of a specific finding, we are bound to conclude that the evidence of complainant was found to be sufficient for this purpose, and the decree granting the divorce is sustained on behalf of the appellant, complainant below.

In *Ammons* v. *Ammons,* 144 Miss. 314, 109 So. 795, it was held that in a divorce case where cruelty is relied upon as a ground of divorce, complainant will not be entitled to a divorce if she provoked the acts constituting the alleged cruelty by her own conduct.

We think on the proof here there is no misconduct on the part of the husband constituting cruelty until the developments referred to following the scene of the shooting, and as such acts were provoked by the misconduct of the defendant in making engagements and keeping company with single men, she being a married woman, causing it to be remarked upon by the friends of her husband to him, it would not sustain her contention for the divorce on the evidence in this record. We must therefore treat the decree as being founded upon the proof introduced

by the complainant. As the court below granted a decree divorcing the parties, if no other question was involved it would be immaterial as to whether the complainant secured the divorce on the ground of adultery or on the ground of cruelty; it would be effective to sever the bonds of matrimony. But the right to alimony and support, and the custody of the child, etc., is involved; and as the wife would not be entitled to support if she were guilty of adultery, and would not be entitled to the custody of her child in such case, it is necessary to consider the chancellor's ruling on the evidence in regard to these things.

The decree granting the divorce will not be reversed, but will be affirmed. But that part of the decree awarding alimony to the wife, and awarding to her the custody of the child, will be reversed and remanded for reconsideration in the court below, in the light of such evidence as may be introduced, in conformity to the views we have expressed.

It was held in *Duncan* v. *Duncan*, 119 Miss. 271, 80 So. 697, that where the father is financially able to take care of a child, and the mother is not, the father, if he is a suitable person, will be given its custody; and the fact that the father drank whisky and played poker to a limited extent did not alone make him an unsuitable person to be entrusted with the custody of his child. In that case the finding of the chancellor awarding the custody of the child was reversed, and the father was given the child. It was a case where the divorce had been granted prior to the decree awarding the custody of the child, on account of the adultery of the wife; but at the time of the awarding of the custody of the child, she was shown to have been a moral person, teaching a Sunday school, and enjoying the esteem of her neighbors and friends.

We think it was error for the court below, on the facts in the record, to grant the permanent custody of the child to the mother, as against the father. The child in this case is of school age, and the decree of the court below

in awarding the father one day, when the child should have been in school, and in awarding the control and custody to the mother permanently, is not justified by the evidence. In such case the leading consideration is the welfare of the child, and the court has the power to look to the interest of the child in awarding custody; but where the father is blameless in his life, better able, and perfectly willing, to support the child, it should not be permanently taken from him under the evidence developed in this record. The chancery court, on remand of the case, will, in the light of the evidence then produced, deal with this question anew; and pending the trial in the chancery court, we think it would be fair to both parents, and promote the welfare of the child, to permit the father to have it from Friday afternoon at four o'clock, until Monday morning at eight o'clock, and the mother to have it the rest of the week.

As to the support of the child, there is no complaint of the amount awarded; but the appellant expresses a willingness to pay whatever is necessary therefor.

As to the alimony of the wife, pending the final decision of the question, we think the decree will be permitted to stand as to the amount allowed her under the decree of the chancellor, except that we think it would be better for the two thousand one hundred dollars per annum for the mother and child to be paid in monthly installments.

As to the motion for additional attorneys' fees for prosecuting the case in this court, we are of the opinion that the decree entered by the other division of the court, allowing five hundred dollars for attorneys' fees for the prosecution of the appeal in this court, and for alimony *pendente lite* adjudicated the right to those amounts, and that the decree allowing the amount, properly construed, allows that sum for the entire service on appeal. There is evidence supporting the amount allowed for compe-

tent and reputable counsel, and the motion for an additional allowance will be overruled.

The judgment of the court below is affirmed as to the granting of the divorce, but is reversed and remanded as to the alimony for the wife, and as to the custody of the child. Decree, to be entered here in accordance with this opinion for the custody of the child and the alimony, until the chancery court further considers the matter at the next term of the court, to be held in Lauderdale county.

*Affirmed in part, and reversed in part.*

## On Suggestion of Error.

A suggestion of error has been filed in this case, not challenging the correctness of the opinion rendered therein, but suggesting that the opinion is silent as to the allowance of one thousand two hundred and fifty dollars, counsels' fees, awarded to the appellee on the trial on the merits in the court below, and that all doubt as to whether this judgment is affirmed or reversed shall be removed.

It was not the purpose of the court, in the decision of the case, to disturb the judgment of the court below as to this item of attorneys' fees; the judgment was affirmed as to matters not stated in the opinion. Therefore, the judgment for one thousand two hundred and fifty dollars to cover attorneys' fees was affirmed, the fees already allowed by the court below being sufficient to cover the full course of the litigation.

In all respects the judgment, as entered, will stand. The suggestion of error will therefore be overruled.

*Suggestion of error overruled.*